IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ERIE DIVISION

| | | |
|---|---|---|
| JAMES EARL JOHNSON, | ) | |
| | ) | |
| Petitioner | ) | Case No. 1:21-CV-00139 |
| | ) | |
| vs. | ) | RICHARD A. LANZILLO |
| | ) | UNITED STATES MAGISTRATE JUDGE |
| THE ATTORNEY GENERAL OF | ) | |
| PENNSYLVANIA, ERIC TICE, DISTRICT | ) | MEMORANDUM OPINION AND ORDER |
| ATTORNEY OF ERIE COUNTY, | ) | ON PETITION FOR WRIT OF HABEAS |
| | ) | CORPUS |
| Respondents. | ) | |
| | ) | ECF NO. 3 |

James Earl Johnson ("Johnson" or "Petitioner"), a prisoner in the custody of the

Pennsylvania Department of Corrections, has filed a petition for writ of habeas corpus pursuant

to 28 U.S.C. § 2254.[1] ECF No. 3. For the reasons set forth below, the Court will deny the

petition and decline to issue a certificate of appealability.[2]

I.      Relevant Factual Background

Johnson challenges the judgment of sentence imposed upon him by the Court of

Common Pleas of Erie County, Pennsylvania, at criminal docket number CP-25-CR-003200-

2010. On direct appeal, the Pennsylvania Superior Court restated the factual background

underpinning Johnson's offenses[3]:

---

[1] 28 U.S.C. § 2254(a) confers jurisdiction upon this Court to hear a petition for writ of habeas corpus filed by an
individual who claims to be in custody pursuant to a state court judgment in violation of the Constitution of the
United States.

[2] The Parties have consented to a United States magistrate judge conducting proceedings in this case, including the
entry of a final judgment, pursuant to 28 U.S.C. § 636(c)(1). *See* ECF Nos. 12, 14.

[3] This Court presumes that the Superior Court's factual findings were correct. *See* 28 U.S.C. §2254(e)(1).

On November 6, 2010, Johnson entered [the victim's][4] unlocked second story apartment and nudged her shoulder to wake her up. [The victim], who was asleep on her bed in the living room with the television on, awoke and saw a tall black man standing over her. She did not recognize him and initially asked if this was a joke. Johnson said this was serious and told her to roll over or he would hurt her. He removed her pants and made her take off her shirt. Then he moved her underwear to the side and put his penis in her vagina. He stuck his tongue in her mouth and threatened to hurt her when she objected to the contact. He ejaculated inside her then grabbed her arm and brought her to the bathroom where he forced her to clean herself. The bathroom was lit and [the victim] was able to see Johnson's face in the mirror. Johnson brought her back to bed, told her to stay there, then left.

[The victim] ran to the window and saw a dark Dodge Durango drive away. She was familiar with this vehicle because she had worked at a Dodge dealership. Once Johnson left, [the victim] called 911. Officer Langdon responded to the residence and took a report of the incident from [the victim], including a description of the suspect and vehicle. He then took [the victim] to the hospital for a rape kit.

The following evening Officer Langdon came across a vehicle illegally parked outside of a bar that matched the vehicle [the victim] described. Officer Langdon went back to get the license plate and observed Johnson standing next to the vehicle. Believing that both the vehicle and Johnson matched [the victim's] description, Officer Langdon spoke to Johnson who provided him with identifying information. Officer Langdon passed this information on to Detective Lawrence.

The following day Detective Lawrence created a photo lineup, which included a photo of Johnson. [The victim] came to the Police Department and viewed the photo lineup but was unable to identify her assailant; however, Detective Lawrence testified that while viewing the lineup she placed her hand over Johnson's photograph, covering it up. At that point Detective Lawrence created a composite sketch of the suspect with [the victim's] help.

The next day [the victim] went to Magisterial District Judge Tom Robie's office, where her mother is employed. [The victim] went into Judge Robie's office where she was shown a single photograph of Johnson on the Megan's Law Website. Judge Robie asked her if that was the person who raped her. [The victim]

---

[4] Opinions of the various state courts referred to the victim by name.  This Court, in its discretion, declines to do.

> vomited and then replied yes. Based on the identification Johnson
> was arrested and charged with the above offenses.
>
> [The victim] positively identified Johnson at the preliminary
> hearing and at trial. Additionally, at trial a serologist from the
> Pennsylvania State Police Crime Lab testified that seminal material
> was present in the vaginal swabs from [the victim's] rape kit, and
> forensic scientist Alex Glessner testified that the DNA mixture
> found on the swabs was much more likely to have come from [the
> victim] and Johnson, than from [the victim] and another man.

*Commonwealth v. Johnson*, No. 1852 WDA 2011, 2014 WL 10889661, at *1-2 (Pa. Super. Ct.

Aug.10, 2012) (unpublished memorandum). After a bench trial, Johnson was found guilty of

rape, burglary, and making terroristic threats.[5]  *Id.*  Prior to sentencing, the Commonwealth

notified Johnson of its intent to seek the mandatory minimum sentence pursuant to 42 Pa. C. S.

§ 9714(a)(2) because his criminal record included three prior convictions for burglary and

rape. On October 17, 2011, the Court of Common Pleas sentenced Johnson to a term of life in

prison without parole on the rape and burglary convictions, and thirty to sixty months in prison

on the terroristic threats conviction. *See id.*

II.     Relevant Procedural Background

    The post-trial procedural history preceding Johnson's petition is lengthy.[6]  Upon

conviction and sentence, Johnson appealed to the Pennsylvania Superior Court on November 23,

2011. The Superior Court affirmed Johnson's conviction and sentence on August 10, 2012.

Johnson then filed a Petition for Allowance of Appeal with the Supreme Court of Pennsylvania

on September 7, 2012, which was denied on October 29, 2012.

---

[5] These are violations of 18 Pa. C. S. § 3121(a)(1); 18 Pa. C. S. § 3502(a); and 18 Pa. C. S. § 2706(a)(1), respectively.

[6] Here, the Court takes judicial notice of the state court's trial and appellate dockets in criminal case CP-25-CR-003200-2010, which are available to the public online at https://ujsportal.pacourts.us (last visited on December 14, 2021). *See, e.g., Burley v. Parra*, 2021 WL 4594674, at *1 (W.D. Pa. Oct. 6, 2021). Citation to the state court dockets will be omitted, unless done for particular emphasis.

On December 13, 2012, Johnson, acting *pro se*, filed a petition in the Court of Common

Pleas seeking relief under Pennsylvania's Post-Conviction Relief Act ("PCRA"). That court

appointed counsel, who then filed a "no merit" letter pursuant to *Commonwealth v. Finley*, 550

A.2d 213 (Pa. Super. Ct. 1998) and *Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988). On

August 5, 2013, the PCRA court[7] issued a notice of intent to dismiss Johnson's PCRA petition

without a hearing pursuant to Pennsylvania Rule of Criminal Procedure 907. Johnson filed

objections to this notice. On October 2, 2013, the PCRA court dismissed the PCRA petition.

Then, on October 28, 2013, Johnson filed a notice of appeal. The Superior Court affirmed the

PCRA court's order on August 22, 2014. Johnson again sought permission to appeal to the

Pennsylvania Supreme Court; his petition was denied on December 23, 2014.

Thereafter, on April 30, 2015, Johnson filed a petition in this Court seeking a writ of

habeas corpus. *See Johnson v. Kerestes*, No. 1:15-cv-00118. Johnson raised two grounds for

habeas relief: first, that his trial counsel was ineffective "for failing to object to the sentencing

court violating [his] Eighth and Sixth Amend[ment] rights by imposing an additional enhanced

sentence for burglary," and second, that his trial counsel was ineffective "for failing to object to

the sentencing court violating his Sixth Amend[ment] rights by enhancing the sentence on judge

found facts." *See* No. 15-cv-0118, ECF No. 1, pp. 5, 7. This Court denied Johnson relief but the

Court of Appeals for the Third Circuit remanded with instructions to grant the writ based on the

joint motion of the parties. *See Johnson v. Superintendent Mahanoy SCI*, 2018 WL 7246835 (3d

---

[7] The Pennsylvania Courts of Common Pleas have original jurisdiction over PCRA petitions. 42 Pa. Cons. Stat. Ann. § 9545(a). PCRA dispositions from the Courts of Common Pleas are appealable to the Pennsylvania Superior Courts. *See, e.g., Commonwealth v. Bennett*, 593 Pa. 382, 930 A.2d 1264 (2007). Herein, the Court will refer to the Court of Common Pleas that heard Johnson's PCRA petition as the "PCRA court." *See, e.g., Boyer v. Houtzdale*, 620 Fed. Appx. 118, 121, n.2 (3d Cir. Aug. 4, 2015).

Cir. Aug. 30, 2018). On October 1, 2018, this Court granted Johnson's petition citing the Parties' agreement that his sentence was illegal. *See* No. 15-cv-118, ECF No. 28.

On December 3, 2018, the state court re-sentenced Johnson to 22 ½ to 45 years of incarceration with credit for time served. Johnson then appealed the discretionary aspects of his new sentence and the Superior Court affirmed on June 24, 2019. *See Commonwealth v. Johnson*, 2019 WL 2578254 (Pa. Supr. Ct. June 24, 2019). Johnson did not seek review from the Supreme Court of Pennsylvania. *Id.*, at *1.

Then, on November 22, 2019, Johnson filed, *pro se*, a "Motion to Correct Illegal Sentence" in the state trial court in which he argued, among other things, that a state magisterial district judge ("MDJ") involved in the case knew the victim personally and employed the victim's mother. Johnson contended that this MDJ, Thomas Robie, coordinated an investigation against him and then advocated for Johnson's guilt to the trial court and other government officials, which actions influenced the bench trial verdict. The state court denied his motion, but the Superior Court vacated that order, holding that the PCRA court erred by not treating his motion as a timely first PCRA petition. *See Commonwealth v. Johnson*, 2020 WL 3640578, at *3 (Pa. Super. Ct. July 6, 2020). The Superior Court did not rule on the merits of Johnson's claims, however.

Counsel was appointed and again, a *Finley/Turner* "no merit" letter was filed. Counsel's letter stated that the issues raised were "essentially a restatement and encapsulation of [Johnson's] original PCRA petition" which was previously denied. The PCRA court dismissed Johnson's petition and he again appealed to the Superior Court. He raised three issues: first, whether the PCRA court erred in ignoring the MDJ's violations of Article 5, Section 17(b) of the

Pennsylvania Constitution;[8] second, whether the trial court erred by denying Johnson equal

protection as afforded by the Fourteenth Amendment to the United States Constitution and

Article 1, § 9 of the Pennsylvania Constitution; and third, whether the PCRA court erred in

failing to cite case law in explaining its decision to deny Johnson's petition. *See Commonwealth*

*v. Johnson*, 2021 WL 1105225, at *2 (Pa. Super. Ct. Mar. 23, 2021).  The Superior Court

affirmed the decision of the PCRA court, concluding that Johnson's first two issues had already

been raised and dismissed previously and that the third issue was not supported by controlling

case law and that, in any event, Johnson had failed to properly develop this argument with

citation to any controlling authority.  *Id.*, at *2-3.

Johnson did not seek permission to appeal to the Supreme Court of Pennsylvania.  He

filed the instant petition for habeas relief on May 16, 2021.  *See* ECF No. 3, p. 15.  Johnson also

filed a "Brief in Support" of his petition.  ECF No. 4.  The Respondents filed a Response on

September 29, 2021 (ECF No. 15), and the state court record was filed on October 12, 2021

(ECF No. 16).[9]

III.    The Standard for Habeas Relief under 28 U.S.C. § 2254

"The writ of habeas corpus stands as a safeguard against imprisonment of those held in

violation of the law." *Harrington v. Richter*, 562 U.S. 86, 91 (2011).  Federal courts reviewing

habeas corpus petitions "must be vigilant and independent ... a commitment that entails

---

[8] This section provides that "Justices and judges shall not engage in any activity prohibited by law and shall not
violate any canon of legal or judicial ethics prescribed by the Supreme Court.  Justices of the peace shall be
governed by rules or canons which shall be prescribed by the Supreme Court." Pa. Const. Art. 5, § 17(b) ("Justice
of the peace" is deemed to refer to a magisterial district judge, pursuant to 2004, Nov. 30, P.L. 1618, No. 207,
§ 28(1)).

[9] The state court record was in hard-copy format only.  It was neither indexed nor continually paginated.  Thus,
unless for particular emphasis, it will not be directly cited to when referenced herein.  Quotations from the trial
transcript, which the Respondents also provided, will be cited with the page number on the official transcript.

substantial judicial resources." *Id.* This case is governed by the federal habeas statute applicable to state prisoners, 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "which imposes significant procedural and substantive limitations on the scope" of the Court's review. *Wilkerson v. Superintendent Fayette SCI*, 871 F.3d 221, 227 (3d Cir. 2017). Under 28 U.S.C. § 2254, federal courts in habeas cases must give considerable deference to determinations of state trial and appellate courts. *See Turner v. Ransom*, 2021 WL 2581251, at *2 (W.D. Pa. June 23, 2021) (citing *Renico v. Lett*, 599 U.S. 766, 772 (2010)). It is Johnson's burden, as the petitioner, to prove he is entitled to the writ. *Id.; see also Turner*, 2021 WL 2581251, at *1 (citing *Vickers v. Superintendent Graterford SCI*, 858 F.3d 841, 848-49 (3d Cir. 2017)).

Johnson must first satisfy specific and precise procedural standards. *See, e.g., Smart v. Pennsylvania*, 2021 WL 1091277, at *3 (M.D. Pa. Feb. 16, 2021). The Supreme Court has explained the gate-keeping function of these procedural standards: "The [AEDPA] established a stringent set of procedures that a prisoner 'in custody pursuant to the judgment of state court'" must follow when seeking the Great Writ. *Burton v. Stewart*, 549 U.S. 147, 152 (2007) (citing 28 U.S.C. § 2244(b)). "One such procedure concerns the filing of 'second or successive' habeas corpus applications challenging that custody[.]"[10] *Id. See also Dixon v. Mahally*, 2021 WL 5883161, at *8 (W.D. Pa. Dec. 13, 2021). Before filing a second or successive petition, a state prisoner must first "move in the appropriate court of appeals for an order authorizing the district court to consider the application." 28 U.S.C. § 2244(b)(3)(A). A three-judge panel of a court of appeals may authorize the filing of a second or successive petition only if the application

---

[10] Although the federal habeas statutes use the term "application," the federal courts, including the United States Supreme Court, use the term "petition" and "application" interchangeably. *See, e.g., Crabb v. Eckard*, 2015 WL 4879071, at *3 n.3 (M.D. Pa. Aug. 14, 2015).

presents a claim not previously raised that satisfies one of the two grounds articulated in

§ 2255(b)(2).  This requirement is jurisdictional.  *Burton*, 549 U.S. at 149.

Here, Johnson has not obtained or sought to obtain any authorization from the Court of

Appeals for the Third Circuit to file the instant petition.  Thus, the Respondents contend that the

pending petition must be dismissed as a second or successive application.  *See* ECF No. 15, pp.

6-7.  The Court will begin its "gate keeping" function with an analysis of that issue.

A.    Johnson's Petition is not a second or successive application and, therefore, appropriately raises issues relating to his underlying conviction.

The AEDPA does not specify when a habeas petition constitutes a "second or successive"

application.  The Supreme Court has explained, however, that "second or successive" is a "term

of art" and that "[t]o determine its meaning, we look first to the statutory context."  *Magwood v.*

*Patterson*, 561 U.S. 320, 332 (2010).  "The limitations imposed by § 2254(b) apply only to a

habeas corpus application under § 2254, that is, an application for a writ of habeas corpus on

behalf of a person in custody pursuant to *the judgment* of a State court."  *Id.* (emphasis in

original).  The Supreme Court further instructed that

> The reference to a state-court judgment in § 2254(b) is significant because the term "application" cannot be defined in a vacuum.  A § 2254 petitioner is applying for something: his petition seeks invalidation (in whole or in part) of the judgment authorizing the prisoner's confinement.  If this petition results in the district court's granting of the writ, the State may seek a new judgment (through a new trial or a new sentencing proceeding).  Thus, both § 2254(b)'s text and the relief it provides indicate that the phrase "second or successive" must be interpreted with respect to the judgment challenged.

*Id.* (citations omitted).  However, a habeas petition is not a "second or successive" application

merely because it is the second or later in time petition which a petitioner has filed after his or

her initial conviction.  *Id.*  Instead, a petition's status as a successive petition depends entirely on

whether it challenges the same judgment which was challenged in a previous petition decided on the merits or dismissed with prejudice. *Id.*, at 333-34; *see also Baskerville v. Robinson*, 2019 WL 468932, at *3 (D.N.J. Sept. 25, 2019). Where there is an intervening judgment between the denial of a first habeas petition and the filing of a second, the second petition attacks the new judgment and is, therefore, not "second or successive" for the purposes of § 2244. *Id.*, at 339, 341-42.

In this case, this Court granted Johnson the writ based on the parties' agreement that his original sentence was illegal. *See Johnson v. Superintendent Mahanoy SCI*, 2018 WL 7246835, at *1 (3d Cir. 2018) and *Johnson v. Kerestes*, No. 15-cv-118, ECF No. 28, p. 1. The state court entered a new judgment of sentence on December 3, 2019. As the Supreme Court made clear, because Johnson's petition challenges this new judgment of sentence, it is not a "second or successive" application. *Magwood*, 561 U.S. at 342.

But Johnson's petition attacks his underlying conviction, not the legality of his new sentence. His sole ground for relief alleges a violation of his Fifth and Fourteenth Amendment rights to due process and equal protection by the involvement of the state MDJ in his underlying criminal proceedings. *See* ECF No. 3, p. 5. In *Magwood*, the Supreme Court did not explicitly answer the more nuanced question presented by Johnson's petition: whether the state court's new judgment of sentence permits him to challenge his original, undisturbed conviction via a new application for the writ.

Several Courts of Appeals have addressed this question and—with two exceptions—concluded that "under *Magwood*, a state prisoner may file a second-in-time habeas petition challenging an undisturbed, underlying conviction after being resentenced." *In re Gray*, 850 F.3d 139, 142 (4th Cir. 2017) (citing *King v. Morgan*, 807 F.3d 154, 158 (6th Cir. 2015) ("[A]

habeas petitioner, after a full resentencing and the new judgment that goes with it, may challenge his undisturbed conviction without triggering the 'second or successive' requirements."); *Insignares v. Sec'y, Florida Dep't of Corr.*, 755 F.3d 1273, 1281 (11th Cir. 2014) ("[W]hen a habeas petition is the first to challenge a new judgment, it is not 'second or successive,' regardless of whether its claims challenge the sentence or the underlying conviction."); *Wentzell v. Neven*, 674 F.3d 1124, 1127 (9th Cir. 2012) (adopting the Second Circuit's approach in *Johnson* and stating, in response to the argument that a petition was second or successive because it raised claims that could have been presented in a prior petition, "[t]he Supreme Court rejected such a 'one opportunity rule' in *Magwood*"); *Johnson v. United States*, 623 F.3d 41, 46 (2d Cir. 2010) ("[W]here a first habeas petition results in an amended judgment, a subsequent petition is not successive regardless of whether it challenges the conviction, the sentence, or both.").[11]

Although the Court of Appeals for the Third Circuit has not addressed this question in a precedential opinion, one panel of Circuit Judges has agreed with the majority of federal courts that a new, intervening judgment of sentence "prevents a subsequent habeas petition from being second or successive." *In re Brown*, 594 Fed. Appx. 726, 729-30 (3d Cir. 2014)). In *Brown*, the panel also recognized that a circuit split existed on the question whether a petition may challenge the underlying conviction upon a resentencing and explicitly rejected the minority view, concluding instead that "the Supreme Court'[s] decision makes clear that a habeas petition is deemed initial or successive by reference to the *judgment* it attacks—not which component of the judgment it attacks or the nature or genesis of the *claims* it raises." *Id.* (citing *Suggs*, 705 F.3d at

---

[11] The Court of Appeals for the Seventh Circuit, relying on its own precedent, reached the opposite conclusion as has the Court of Appeals for the Fifth Circuit. *See Suggs v. United States*, 705 F.3d 279, 282-85 (7th Cir. 2013) and *In re Lampton*, 667 F.3d 585 (5th Cir. 2012).

287-88 (Sykes, J., dissenting) (emphasis in original)). *See also Norwood v. United States*, 2015 WL 5822874, at *4 (D.N.J. Sep. 30, 2015) (quoting *In re Brown*). Thus, the Court of Appeals concluded that "where a first habeas petition results in an amended judgment, a subsequent petition is not successive regardless of whether it challenges the conviction, the sentence, or both." *In re Brown*, 594 Fed. Appx. at 729 (quoting *Johnson*, 623 F.3d at 46). *See also United States v. McMillian*, 2015 WL 4772991, at *3 (M.D. Pa. Aug. 12, 2015)( "In *In re Brown*, the Court of Appeals concluded that a § 2254 petition challenging a new judgment can raise claims that could have been brought in the original § 2254 petition.").

Although the Court of Appeals' decision in *In re Brown* was issued as a non-precedential opinion and is not to be considered binding precedent,[12] the decision is persuasive, nonetheless. *See, e.g., Norwood*, 2015 WL 5822874, at *4. In *Brown*, the panel recognized that a criminal judgment is "made up of both a finding of guilty and a sentence. Thus, while a resentencing may only address one component of the prior judgment, by altering that component, the end result is an entire new judgment for *Magwood* purposes." *Norwood*, 2015 WL 5822874, at *5 (citing *Brown*, 594 Fed. Appx. at 729-30; *see also Johnson*, 623 F.3d at 45-46). Therefore, *Brown* and other extra-circuit precedent support this Court's conclusion that—given the intervening resentencing—Johnson's instant § 2254 application is not a second or successive petition where it attacks the undisturbed portions of the prior judgment of conviction. *See, e.g., id.* Having concluded that Johnson's petition is not a second or successive application, and that he may properly attack his underlying conviction, the Court turns next to whether it was timely filed.

     B.     Johnson's Petition is timely.

---

[12] *See* Court of Appeals Internal Operating Procedure 5.5 and 5.7.

The AEDPA imposes a one-year limitations period for state prisoners seeking federal habeas review.  It is codified at 28 U.S.C. § 2244(d) and provides:

(1)    A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –

    (A)    the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B)    the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

    (C)    the date on which the constitutional right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D)    the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

(2)    The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this section.

28 U.S.C. § 2244(d).

In analyzing whether a petition for writ of habeas corpus has been timely filed under the one-year limitations period, a federal court must undertake a three-part inquiry.  First, a court must determine the "trigger date" for the one-year limitations period pursuant to section 2244(d)(1). *See Caldwell v. Mahally, et al.*, 5741706, *5 (W.D. Pa. Nov. 5, 2019).  Second, the court must determine whether any "properly filed" applications for post-conviction or collateral relief were pending during the limitations period that would toll the statute under section

2244(d)(2).  *Id.*  And third, the court must determine whether any of the other statutory exceptions or equitable tolling should be applied on the facts presented.  *Id.*

As noted above, Johnson's petition raises just one claim.  In Ground One, he states that his due process rights under the Fifth and Fourteenth Amendments were violated "by Magisterial District Judge Tom Robie before and after Petitioner's arrest."  ECF No. 3, p. 15, ¶ 12.  The "trigger date" for this claim is the date on which Johnson's judgment of sentence became final.  *See Swartz v. Meyers*, 204 F.3d 417, 419 (3d Cir. 2000) (noting that a judgment becomes final after direct review or the expiration of time for seeking such review, including the time limit (90 days) for filing a writ of certiorari in the United States Supreme Court).  Here, the applicable timeline is as follows.

Upon the granting of the writ of habeas corpus by this Court, Johnson was resentenced in state court on December 3, 2018.  The United States Supreme Court has noted that pursuant to the AEDPA, "the limitations period applicable 'to a person in custody pursuant to the judgment of a State court' shall run from . . . the date on which the judgment became final by the conclusion of direct review or the expiration of time for seeking such review.  Final judgment in a criminal case means sentence. The sentence is the judgment." *Burton v. Stewart,* 549 U.S. 147, 156-57 (2007) (quoting *Berman v. United States*, 302 U.S. 211, 212 (1937) (citation to statute omitted)).  Thus, when a state court petitioner, like Johnson here, has been resentenced, the limitations period under § 2244(d)(1)(A) runs from the judgment entered upon resentencing— even if the habeas petition challenges the underlying conviction.  *See generally*, Brian R. Means, *Commencement of the one-year statute of limitations—Finality of conviction, Postconviction Remedies* § 25:13 (2018); Brian R. Means, *Not the same judgment—Intervening judgments*, Federal Habeas Manual § 11:47 (2018); and Brian R. Means, *Appellate remand and*

*resentencing; new, corrected, or intervening judgments; restitution orders*, Federal Habeas

Manual § 9A:18 (2018). *See also Woodfolk v. Maynard*, 857 F.3d 531, 542-43 (4th Cir. 2017);

*Rashad v. Lafler*, 675 F.3d 564, 567-68 (6th Cir. 2012) (judgment became final upon conclusion

of direct review of the new sentence petitioner received at resentencing); *Scott v. Hubert*, 635

F.3d 659, 666 (5th Cir. 2011) ("we hold that when a state prisoner's conviction is affirmed on

direct appeal but the sentence is vacated for resentencing, the judgment of conviction does not

become final within the meaning of 28 U.S.C. § 2244(d)(1)(A) until both the conviction and the

sentence have become final by the conclusion of direct review or the expiration of the time for

seeking such review"); *Cochran v. Phelps*, 600 F. Supp. 2d 603, 607 (D. Del. 2009); *King v.

Johnson*, 2017 WL 1709596, at *2 n.2 (D.N.J. May 1, 2017); *Johnson v. Warden, Lebanon Corr.

Inst.*, 2010 WL 2889056, at *6 (S.D. Ohio June 23, 2010), *report and recommendation adopted*,

2010 WL 2889057 (S.D. Ohio July 20, 2010); *Blackstone v. Gilmore*, 2018 WL 6985206, at *6

(M.D. Pa. Oct. 15, 2018), *report and recommendation adopted*, 2019 WL 144932 (M.D. Pa. Jan.

9, 2019); *Downward v. Overmyer*, 2015 WL 10568891, at *6 n.6 (E.D. Pa. Aug. 27, 2015),

*report and recommendation adopted*, 2016 WL 1241882 (E.D. Pa. Mar. 30, 2016).

 Johnson then appealed to the Superior Court, which affirmed his conviction and

resentencing on June 24, 2019. *See Commonwealth v. Johnson*, 2019 WL 2578254, at *1 (Pa.

Super. Ct. June 24, 2019). Johnson had until July 24, 2019 to file a petition for allowance of

appeal with the Supreme Court of Pennsylvania, but did not do so.[13] The AEDPA clock thus

began running on July 25, 2019.

 That clock stopped on November 22, 2019, upon Johnson's filing of a PCRA petition. At

this point, 120-days had elapsed on the AEDPA clock. Johnson labeled this petition a "Motion

---

[13] *See* 42 Pa. C.S.A. § 9545(b)(3); Pa. R. A. P. 1113(a). Thirty days had elapsed on the AEDPA clock by this point in time.

to Correct Illegal Sentence" and the court denied the motion on December 3, 2019.  Johnson

appealed and the Superior Court reversed, faulting the PCRA court for not construing his motion

as a post-conviction petition and for not appointing counsel.  *See Commonwealth v. Johnson*,

2020 WL 3640578, at *2 (Pa. Super. Ct. July 6, 2020).  On remand, the PCRA Court treated

Johnson's motion as a PCRA petition and denied it on December 3, 2019.  Johnson appealed to

the Superior Court which affirmed the PCRA court on March 23, 2021.  *See Commonwealth v.

Johnson*, 251 A.3d 1257 (Pa. Super. Ct. 2021).  Johnson did not seek permission to appeal to the

Supreme Court of Pennsylvania.  Thus, the AEDPA clock began to run when the time for doing

so elapsed—April 23, 2021.  *See Swartz v. Meyers*, 204 F.3d 417, 420-21 (3d Cir. 2000).  Two-

hundred and forty-five days remained on the ADEPA clock, which means Johnson had until

December 24, 2021, to file a timely federal habeas petition.  For purposes of the prisoner

mailbox rule, Johnson's habeas petition was filed on May 5, 2021, the date he signed it.  *See,

e.g., Scales v. Atty. Gen. of Penna.*, 2018 WL 3823779, *1 (W.D. Pa. Aug. 10, 2018) (discussing

mailbox rule).  Thus, Johnson's petition has been timely filed.

       C.       Exhaustion and Procedural Default

       As a general matter, a federal district court may not consider the merits of a habeas

petition unless the petitioner has "exhausted the remedies available" in state court.  *See* 28

U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  A petitioner satisfies

the exhaustion requirement "only if [the petitioner] can show that [he or she] fairly presented the

federal claim at each level of the established state-court system for review."  *Holloway v. Horn*,

355 F.3d 707, 714 (3d Cir. 2004).  The purpose of the exhaustion requirement is to "give the

state courts a full and fair opportunity to resolve federal constitutional claims before those claims

are presented to the federal courts ... by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845.

To "fairly present" a claim for exhaustion purposes, the petitioner must advance the claim's "factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *Bennett v. Superintendent Graterford SCI*, 886 F.3d 268, 280 (3d Cir. 2018) (quoting *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999)). A petitioner may exhaust a federal claim either by raising it on direct appeal or presenting it in post-conviction PCRA proceedings. *O'Sullivan*, 526 U.S. at 845; *see also Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples*, 489 U.S. 346, 351 (1989). Either way, the petitioner must present his federal constitutional claims "to each level of the state courts empowered to hear those claims." *Id.* at 847 ("requiring state prisoners [in order to fully exhaust their claims] to file petitions for discretionary review when that review is part of the ordinary appellate review procedure in the State"). "In Pennsylvania, the fair presentation requirement means that a petitioner must bring the claim to the Pennsylvania Superior Court." *Gibbs v. Estock*, 2021 WL 1842717, at *2 (E.D. Pa. Apr. 22, 2021), *report and recommendation adopted*, 2021 WL 1837431 (E.D. Pa. May 7, 2021), *certificate of appealability denied sub nom. Gibbs v. Superintendent Pine Grove SCI*, 2021 WL 5859469 (3d Cir. Aug. 24, 2021) (other citations omitted). "Once a petitioner's federal claims have been fairly presented to the state's highest court, the exhaustion requirement is satisfied." *Stoss v. Estock*, 2019 WL 2160464, at *3 (M.D. Pa. May 17, 2019) (citing *Castille v. Peoples*, 489 U.S. 346, 350 (1989)).

An important corollary to the exhaustion requirement is the doctrine of procedural default. "Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal

claims has deprived the state courts of an opportunity to address" the merits of those claims "in the first instance." *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991).  Procedural default intertwines with exhaustion in this way: when a claim has never been "'fairly presented' to the state courts, but state procedural rules bar the applicant from seeking further relief in state courts, the exhaustion requirement is satisfied" because of the lack of available state process, but the claims "are considered to be procedurally defaulted." *McKenzie v. Tice*, 2020 WL 1330668, at *5 (M.D. Pa. Mar. 23, 2020) (quoting *McCandless v. Vaughn*, 172 F.3d 255, 261 (3d Cir. 1999)). Such claims may not ordinarily be reviewed by a federal court. *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) ("[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule.") (citations omitted).

Several caveats exist.  First, "[a] state procedural rule can preclude federal habeas corpus review" only when the state rule is "independent of the federal question [presented] and adequate to support the judgment." *McKenzie*, 2020 WL 1330668, at *5 (quoting *Leyva v. Williams*, 504 F.3d 357, 365 (3d Cir. 2007)).  A rule is "independent" if it is not "'so interwoven with federal law' that it cannot be said to be independent of the merits of a petitioner's federal claims." *Id.* (quoting *Johnson v. Pinchak*, 392 F.3d 551, 557 (3d Cir. 2004)).  A rule is "adequate" if it was "firmly established, readily ascertainable, and regularly followed at the time of the purported default." *Leyva*, 504 F.3d at 366 (quoting *Szuchon v. Lehman*, 273 F.3d 299, 372 (3d Cir. 2001)).

Second, a petitioner can overcome procedural default, thereby permitting federal court review, if the petitioner can establish either: (1) "cause" for the default and "actual prejudice" because of the alleged violation of federal law; or (2) that the failure to consider the claims will

create a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. To establish cause and

prejudice, the petitioner must show some objective factor external to the defense that impeded

counsel's efforts to comply with a state procedural rule. *Slutzker v. Johnson*, 393 F.3d 373, 381

(3d Cir. 2004) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). To establish a

fundamental miscarriage of justice, a habeas petitioner must typically show actual innocence.

*Schlup v. Delo*, 513 U.S. 298, 324-26 (1995). With these standards and rules in mind, the Court

now turns to a discussion of Johnson's claim.

      D.      Johnson has properly exhausted his claim.

      Johnson's petition presents the following ground for relief:

> Petitioner's Fifth and Fourteenth Amendment Right to Due Process
> of law and equal protection of the law were violated by magisterial
> district judge Tom Robie before and after Petitioner's arrest.

ECF No. 3, p. 5, ¶ 12. Thus, Johnson's petition appears to allege due process violations under

the Fifth and Fourteenth Amendments as well as an equal protection violation under the

Fourteenth Amendment. The Respondents construe this claim somewhat differently:

> In the instant petition, the Petitioner raises three issues stemming
> from alleged conduct engaged in by MDJ Robie. He argues that
> first, MDJ Robie's conduct violated the dictates of Article 5
> Section 17(b) of the Pennsylvania Constitution. The second and
> third issues raised are that MDJ Robie also violated the rights
> afforded to the Petitioner by the Fifth and Fourteenth Amendments
> of the United States Constitution. The first and second issues were
> raised both in Petitioner' PCRA Petition and pro se appeal. The
> third issue, regarding the Fourteenth Amendment was not raised in
> the Petitioner's pro se appeal and thus, the third issue is
> unexhausted.

ECF No. 15, p. 6. Johnson's perceived failure to raise his Fourteenth Amendment claim,

Respondents argue, render his a "mixed petition," which they contend should be dismissed. The

Court disagrees.

At the outset, two points of clarification are necessary concerning the nature of Johnson's

habeas claim.  First, Respondents are incorrect that Johnson's federal habeas petition raises a

claim under the Pennsylvania Constitution.  As quoted verbatim above, his lone ground for relief

does not implicate the Commonwealth's Constitution, instead referencing only his rights under

the Constitution of the United States.  *See also* ECF No. 3, p. 5.  Second, insofar as Johnson

alleges a denial of substantive due process as a ground for habeas relief, his invocation of the

Fifth Amendment's due process clause is misplaced as it has no applicability under the facts of

this case.  *See, e.g., Thomas v. Palakovich*, 2012 WL 1079441, at *6 (M.D. Pa. Mar. 30, 2012).

"The Due Process Clause of the Fifth Amendment applies to actions of the federal government,

while the Due Process Clause of the Fourteenth Amendment applies to state actors."  *Id.* citing

U.S. Const. amend. V; U.S. Const. amend. XIV, § 1; *B & G Const. Co., Inc. v. Dir. Office of*

*Workers' Comp. Programs*, 662 F.3d 233, 246 n. 14 (3d Cir. 2011).  Here, because Johnson does

not allege any actions on the part of the federal government, there is no basis for a Fifth

Amendment claim here.  *See Lanz v. Link*, 2020 WL 998655, at *12 (W.D. Pa. Mar. 2, 2020);

*Sanchez v. Walton*, 2018 WL 4689454, at *2 (E.D. Pa. Sep. 28, 2018).  Thus, what is left in

Johnson's petition as cognizable grounds for habeas relief are claimed violations of his rights to

due process and equal protection under the Fourteenth Amendment.  Both claims have been

exhausted.

        1.     Exhaustion

Johnson contends that MDJ Robie, who knew the victim through his employment of her

mother, instigated and influenced the criminal investigation that ultimately implicated Johnson

and prejudiced the case against him at both the preliminary stage of his prosecution and the

bench trial.  He claims the state MDJ coordinated the investigation that led to his arrest and

advocated for Johnson's guilt to the trial court and thereby tainted his conviction and sentence in violation of his rights to due process and equal protection.  The record supports the determination that Johnson exhausted these claims because he presented them to the PCRA court and the Superior Court and in so doing, alerted the state courts to the federal nature of his claims.

In his most recent PCRA petition, filed on November 22, 2019, Johnson contended that his sentence was "illegal due to violations of the Fourteenth Amendment due process clause of the United States Constitution."  He also asserted that the actions of the state MDJ were "violations of the Petitioner's right to Equal Protection."  Johnson also raised this claim in his first PCRA petition, filed in December of 2012.  There, he contended that his "due process rights were violated even before his arrest … by the involvement of District Judge Tom Robie on the behalf of the victim and her family."  Thus, Johnson exhausted these claims in state court.  *See Greene v. Palakovich*, 606 F.3d 85, 103, n.12 (3d Cir. 2010) (noting the presentation requirement for a § 2254 petition to be "comparatively loose"); *Cristin v. Brennan*, 281 F.3d 404, 410 (3d Cir. 2002).

2.      Procedural Default

That Johnson exhausted these claims does not preclude a possible procedural default. As the Supreme Court instructed, a procedural default "forecloses relief even when the petitioner has exhausted his remedies."  *See O'Sullivan,* 526 U.S. at 850 (Stevens, J., dissenting); *see also id.* at 848 (O'Connor, J., writing for the majority) ("We do not disagree with Justice Stevens' general description of the law of exhaustion and procedural default" and "[s]pecifically, we do not disagree with his description of the interplay of these two doctrines."); *see also Boyd v.*

*Waymart*, 579 F.3d 330, 368 (3d Cir. 2009) (citing *Holloway v. Horn*, 355 F.3d 707, 717-18 (3d Cir. 2004)).[14]

Johnson's claims are not procedurally defaulted. The PCRA court incorporated PCRA counsel's conclusion that Johnson's claims were "essentially a restatement and encapsulation of [Johnson's] original PCRA petition denied October [], 2013," into its opinion, noting that the claims were 'indistinct factually and legally' from those presented in his first PCRA petition." *Commonwealth v. Johnson*, 251 A.3d 1257 (Pa. Super. Ct. Mar. 23, 2021) (Table).   In affirming that dismissal, the Superior Court concluded that

> This Court has reviewed the arguments advanced in Appellant's brief and the claims he raised in his current PCRA petition and in the PCRA petition he filed in December 2012. Our review indicates that Appellant raised in his December 2012 petition the exact issues he has set forth in the instant PCRA petition. The PCRA court dismissed those issues in 2013, and this Court affirmed the PCRA court's order. Accordingly, Appellant 'previously litigated' his [due process and equal protection] issues and they are thus, not cognizable under PCRA.

*Id.* at *2. The Superior Court acknowledged that Johnson had been resentenced, but noted that "following his resentencing, Appellant's right to PCRA review was limited to the legality of sentence issue underlying his resentence." *Id.* (citation omitted). The Court then explained that "the prior resolution of [the claims raised in his second PCRA petition] and in this appeal, was not within the scope of the resentencing proceeding. Accordingly, because the PCRA court considered and dismissed these issues in 2013, they have been 'previously litigated' for purposes of the PCRA." *Id.*, at *3. *See also* 42 Pa. Cons. Stats. Ann. § 9543(a)(3).

---

[14] There are four opinions in *Boyd.* Judge Hardiman spoke for the majority on the question of whether the previous litigation rule in § 9544(a) could constitute an adequate and independent state law ground to bar habeas review of a claim. *See Boyd*, 579 F.3d at 332 (per curiam) (announcing the court's holdings and identifying the opinions that contain the reasoning for those holdings).

"When a state court declines to review the merits of a petitioner's claim on the ground that it has done so already, it creates no bar to federal habeas review." *Cone v. Bell*, 556 U.S. 449 (2009). That is, "treating Pennsylvania's 'previously litigated' rule as a procedural default would contravene the very purpose of that doctrine: to ensure that state courts have had an opportunity to address [a petitioner's claims] in the first instance." *Boyd*, 579 F.3d at 369. As one court explained,

> A finding that a PCRA claim is 'previously litigated' carries no implication of procedural error on the petitioner's part. It solely indicates that the petitioner had previously raised the claim, and lost. Therefore, unlike genuine procedural requirements such as statutes of limitations or rules governing waiver, the 'previously litigated' rule is not one that a petition can obey in order to obtain PCRA review of his claim.

*Johnson v. Mahally,* 2019 WL 1285465, at *4 (M.D. Pa. Mar. 20, 2019). Thus, the Superior Court's conclusion that Johnson's claims had been "previously litigated" does not present a procedural default.

Inasmuch as Johnson's Fourteenth Amendment due process and equal protection claims are timely, have been properly exhausted, and are not procedurally defaulted, the Court now turns to a determination of the merits of those claims.

IV.     Merits of Johnson's Petition

   A.     Standard of Review

In reviewing the merits of a habeas claim, the typical "first step" is for the Court to identify the appropriate standard of review. If the claim was adjudicated on the merits in the state court, the federal court is required to review the state court's decision with deference. *See, e.g., Dixon v. Mahally*, 2021 WL 5883161, at *7 (W.D. Pa. Dec. 13, 2021). If the claim was not adjudicated on the merits by the state court, the federal court conducts its review *de novo*.

*Bennett v. SCI Graterford*, 886 F.3d 268, 281 (3d Cir. 2018). And, in those cases where it is unclear whether AEDPA deference applies, federal "[c]ourts can … deny writs of habeas corpus under § 2254 by engaging in de novo review." *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) (citing 28 U.S.C. § 2254(a)). Here, however, it is not necessary to determine whether Johnson's claims were "adjudicated on the merits" for purposes of determining which standard of review applies because Johnson cannot show he is entitled to relief under "the more favorable" *de novo* standard of review. *See, e.g., Hannibal v. Gilmore*, 2021 WL 4597084, at *15 (E.D. Pa. Feb. 23, 2021), *report and recommendation adopted*, 2021 WL 4592189 (E.D. Pa. Oct. 6, 2021) (citing *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010) ("Courts can ... deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review[.]") (citing 28 U.S.C. § 2254(a)); *Waller v. Varano*, 562 Fed. Appx. 91, 93 (3d Cir. 2014) (not precedential)).

B.      Johnson's Fourteenth Amendment due process claim does not merit relief.

It is Johnson's burden to establish that his constitutional rights were violated. *See Turner v. Coleman*, 2016 WL 3999837, at *6 (W.D. Pa. July 26, 2016) (citing *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) ("On a petition for a writ of federal habeas corpus, the petitioner bears the burden of proving by a preponderance of the evidence that his constitutional rights have been violated.")). Johnson has not met his burden with respect to his claimed due process violation.

At the outset, the Court observes that the exact nature of Johnson's due process claim is somewhat unclear. He does not appear to argue that the MDJ's rulings or findings of fact in any proceeding were the result of judicial bias. Nor could he because the state court record does not

indicate MDJ Robie presided over a preliminary hearing or made any factual or credibility findings relating to the case.

Instead, Johnson's claim is that MDJ Robie "used his office to investigate," and called "[the assistant district attorney] and Detective Christopher Lawrence to inform them of the [victim's] identification and how it was made." ECF No. 3, ¶ 12, p. 5. He also asserts that MDJ Robie "appeared with the victim at the office" of another MDJ for the Petitioner's preliminary hearing and appeared "at court for Petitioner's trial." [15]  *Id.* That MDJ Robie may have attended Johnson's preliminary hearing with the victim, however, is no violation of Johnson's constitutional rights as such proceedings are open to the public. The same is true for Robie's attendance at Johnson's trial. That he called the investigating detective and prosecuting attorney to relay information he learned from the victim also does not implicate due process.

But Johnson's claim that MDJ Robie "called the victim to his office to show her a photo of Petitioner on his computer on the Megan's Law website for identification" does raise a due process concern related to the potentially suggestive nature of her identification. *See* ECF No. 4, p. 4. The victim testified:

> Q:    And did you have an occasion to go to Judge Robie's office
>       to – on any day around that time?

---

[15] The Court acknowledges the existence of significant confusion in the state court record concerning whether a preliminary hearing on the criminal charges against Johnson was conducted and, if so, the identity of the judicial officer who conducted the hearing. Johnson contends that "MDJ Robie did appear with the victim at the office of Magisterial District Judge Dominic Di Paolo for Petitioner's preliminary hearing." ECF No. 3, p. 5, ¶ 12. But the state court docket does not memorialize any proceeding before MDJ Di Paolo. The victim testified at trial that she attended but did not testify at Johnson's preliminary on December 14, 2019, but again, the state court docket includes no indication that a preliminary hearing took place on that or any other date. The Pennsylvania Superior Court recited that a preliminary hearing was conducted, and strongly implied that the victim testified at it. *See Commonwealth v. Johnson*, 2014 WL 10889661, at *1-2 ("[The victim] positively identified Johnson at the preliminary hearing."). The Respondents assert that Johnson waived his preliminary hearing on the charges. *See* ECF No. 15, p. 8. While the state court docket includes a notation that Johnson waived the charges against him, presumably at the preliminary hearing, it includes no entry indicating when that hearing took place. But in the end, this confusion is not material to the outcome of Johnson's petition because, as the Court notes *infra.*, independent indicia of reliability overcome any concerns with the suggestive nature of the victim's pre-trial identification and the trial judge's verdict is amply supported by the record.

A:     Yes.

Q:     Okay.  And tell us were you asked by Judge Robie to view a photograph on the Internet?

A:     Yes.

***

Q:     And did the Judge have a photograph available for you to look at?

A:     Yes.

Q:     And did he ask you if that was, in fact, the person who had assaulted you?

A:     Yes.

Q:     And what was your answer to that?

A:     First I vomited and then it was a yes.

Trial Transcript at p. 29.  Robie then contacted the District Attorney and investigating detective to inform them of the victim's identification.  ECF No. 4, p. 4.  Here, Johnson raises a concern that the Megan's Law website, as a repository for information and identification of sexual offenders, was unduly suggestive and rendered the victim's initial identification constitutionally suspect.

Regarding pretrial identifications, "due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry v. New Hampshire*, 565 U.S. 228, 238–39 (2012); *Manson v. Braithwaite*, 432 U.S. 98, 107 (1977); *Neil v Biggers*, 409 U.S. 188, 198 (1972).  That the MDJ conducted his own investigation (possibly with the assistance of the victim's mother) is not a due process

violation.[16]  There is no evidence in the record to suggest that the MDJ was acting as a "police

officer" or investigatory agent of the police.  His actions in locating and then showing the victim

a photograph from the Megan's Law website, despite it being done in his magisterial district

judge's office, was no different than private citizen accessing that site and showing a photo to the

victim.  *See, e.g., United States v. Maez*, 2017 WL 2590736, at *1-2 (N.D. Ind. June 15, 2017)

(bank tellers identified bank robber based on pictures they independently found on the county

jail's website).   Furthermore, the victim herself could also have accessed this website on her

own.  Moreover, nothing in the record suggests that any law enforcement officer or agency

directed or even suggested that the MDJ use the website—he appears to have done it on his own

to assist a family member of his secretary.[17]  *See, e.g., Maez*, 2017 WL 2590736, at *2.  Thus,

the record does not support that the victim's identification was arranged by law enforcement or

the prosecution.  On that basis alone, this claim is without merit.

Moreover, even if the victim's identification could be attributed to law enforcement,

Johnson has failed to show that other factors supporting the identification's reliability did not

outweigh any suggestiveness.  "[R]eliability is the linchpin in determining the admissibility of

identification testimony."  *Manson,* 432 U.S. at 114.   "The factors to be considered ... include

the opportunity of the witness to view the criminal at the time of the crime, the witness' degree

of attention, the accuracy of his prior description of the criminal, the level of certainty

---

[16] There was some testimony at Johnson's trial to indicate that the victim's mother—who worked as a secretary for MDJ Robie—may have assisted the MDJ in finding Johnson's picture on the Megan's Law website.  For example, the investigating detective testified that he learned the victim had identified Johnson when he received a call from MDJ Robie: "I was asked to come over and talk to *them* about the discovery *they* may have made with ----."  Trial Transcript, p. 50 (emphasis added).  Additionally, when asked by the Court whether "it would be a better case for you if this were just the family of the victim [searching the Megan's Law website]," the prosecutor responded, "that's what I would say to the Court, it is the family of the victim."  Trial Transcript, p. 85.

[17] At trial, the prosecutor stated that MDJ's search of the Megan's Law website "wasn't done on behalf of the police, I think that's clear."  Trial Transcript, p. 85.

demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself." *Manson*, 432 U.S. at 114; *United States v. Gatto*, 924 F.2d 491, 498 (3d Cir. 1991). If the "indicators of [a witness'] ability to make an accurate identification are [ ] outweighed by the corrupting effect" of law enforcement suggestion, the identification should be suppressed. *Manson*, 432 U.S. at 116.

Here, the indicia of the victim's identification include the opportunity the victim had to view Johnson at the time of the crime, the victim's degree of attention, the accuracy of her description of Johnson, the level of certainty she demonstrated when identifying him, and the time between the crime and her identification. *See United States v. Anthony*, 458 Fed. Appx. 215, 218 (3d Cir. 2012) (quoting *Mason*, 432 U.S. at 114)).

First, the victim had ample opportunity to see her rapist on the night of the attack. She testified that after raping her, he took her into the bathroom:

> A:  And he was talking to me, so I looked up at him in the
>      mirror and that's when I saw how tall he really was, how he
>      towered over me and his facial features.
>
> Q:  Were you able to see him in the mirror?  He was behind
>      you?
>
> A:  He was directly behind me.  He had my right arm.
>
> Q:  And is the mirror over the bathroom sink?
>
> A:  Yes ma'am.

Trial Transcript, p. 19-20. On cross-examination, the victim added further specifics, stating that there was a light on in the bathroom, and that her attacker told her to "stop trying to look" at him, "but I had already seen him." *Id.*, p. 36. She also testified that she was able to see him for

approximately thirty seconds. *Id.* The victim also recognized the Petitioner when she appeared

for Johnson's preliminary hearing but did not have to testify:

> Q:   You were also present at a preliminary hearing in this
>       matter where you did not have to testify, correct?
>
> A:   Yes, ma'am.
>
> Q:   Did you see the person that did this to you at that time?
>
> A:   Yes ma'am.
>
> Q:   And who was that?
>
> A:   That man right there. (indicating the Defendant).

Trial Transcript, p. 21.

Furthermore, her description was detailed and matched Johnson. For example, consistent

with Johnson's physical characteristics, she noted that her attacker was a "very, very tall" Black

man and recalled that when he forcibly stuck his tongue in her mouth, that he was "missing

several teeth." Trial Transcript, pp. 16-17. The victim expressed no doubts or qualifications

about her identification. She stated that Johnson's "was the only face I saw in my mirror." Trial

Transcript, p. 21. The victim's pretrial identification of Johnson took place within days of her

attack. She testified that she went to the police department to view a photographic line-up and to

work with a sketch artist within a day of her attack and then identified Johnson at MDJ Robie's

office a few days thereafter. *See* Trial Transcript, pp. 27-29.

Thus, the victim's testimony established that she had an opportunity to view her attacker

at the time of the rape, that she identified him with a great degree of detail and certainty, and that

the time between the crime and her identification was minimal. *See e.g., Manson*, 432 U.S. at

114. All these factors favor the reliability of the victim's pretrial identification. Thus, even if

the identification procedures at the MDJ's office, including the use of the Megan's Law website,

could be attributed to law enforcement, and considered unduly suggestive, other indicia

supporting the reliability of the identification outweigh the suggestiveness.  The victim's pretrial

identification did not, therefore, violate Johnson's due process rights.

And finally, even were the Court to conclude that the use of the Megan's Law website

was unduly suggestive, where there is independently reliable evidence of a defendant's identity,

an argument that a pretrial identification procedure deprived the defendant of due process is

without merits.  *See, e.g., Briscoe v. Ercole*, 565 F.3d 80, 99 (2d Cir. 2009) ("No holding of the

Supreme Court precludes consideration of corroborative evidence in determining the

independent reliability of an unnecessarily suggestive eyewitness identification.") (Korman, J.,

concurring).  *See also Jones v. Chetirkin*, 2018 WL 3831332, at *5 (D.N.J. Aug. 13, 2018)

(identification of defendant was corroborated by other evidence).  Here, corroborative evidence

exists in the form of DNA, a fact that Johnson's petition ignores.  At trial, the Commonwealth

presented testimony from Alex Glessner, a forensic DNA scientist from the Pennsylvania State

Police.  Glessner testified that samples taken from the victim's rape kit included the DNA of two

people and that the possibility that the DNA mixture profile of the samples could be attributed to

victim and any person other than Johnson were infinitesimally small:

> A:   the combination of DNA types, within this mixture profile
> is forty-one million times more likely to have originated
> from [the victim] and James Johnson than from [the victim]
> and another individual in the unrelated Caucasian
> population, twenty-four quadrillion times more likely than
> another individual in the unrelated African American
> population and sixty-four quadrillion times more likely
> than another individual in the unrelated Hispanic
> population.  And the mixture of DNA profiles can be
> explained by those two contributors.

Trial Transcript, testimony of Alex Glessner, p. 8.  Glessner concluded that "everything that's

there is accounted [for] by those two previously mentioned individuals [the victim and

Johnson]." *Id.* Thus, the victim's pretrial identification was corroborated by independent scientific evidence.

Thus, considering the totality of the evidence in the state court record and based on the Court's de novo review of the record, Johnson has not established a violation of his due process rights and is not entitled to habeas corpus relief.

C.     Johnson's Fourteenth Amendment equal protection claim does not merit relief.

Nor is Johnson entitled to habeas corpus relief on his equal protection claim. He bases this claim on the same facts he relied upon for his due process claim: the MDJ's involvement in the victim's identification of Johnson as her assailant. These facts are also insufficient to support an equal protection violation.

The Equal Protection Clause of the Fourteenth Amendment provides that a state shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Amend. 14. As such, the Equal Protection Clause requires that all persons "similarly situated" be treated alike by state actors. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). An equal protection claim can be brought by a "class of one," a plaintiff alleging he has been "intentionally treated differently from others similarly situated and ... there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). If a distinction between persons does not implicate a suspect or quasi-suspect class, state action will be upheld if it is rationally related to a legitimate state interest. *See Tillman v. Lebanon County Corr. Facility*, 221 F.3d 410, 423 (3d Cir. 2000). Proof of disparate impact alone, however, is not sufficient to succeed on an equal protection claim; a plaintiff must also prove the defendant intended to discriminate. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-66 (1977). Discriminatory intent must be a motivating factor in

the decision, even though it need not be the sole motivating factor. *See id.* at 265-66. Moreover, to prove the difference in treatment lacked a rational basis, a plaintiff must negate every conceivable rational basis for his differential treatment. *See Bd. of Trustees v. Garrett,* 531 U.S. 356, 367 (2001).

Johnson has not alleged any facts to support a finding that his rights under the Equal Protection Clause were violated by the victim's pretrial identification. He has not identified the protected class of which he is a member and upon which he was allegedly discriminated, and he has not demonstrated the discriminatory intent on the part of any state actor to establish a "class of one" claim. As discussed *supra*, Johnson's claim that the victim's pretrial identification was unduly suggestive is meritless. Given that sufficient indicia of reliability supported the victim's pretrial identification, no violation of Johnson's equal protection rights occurred when the trial court refused to suppress the identification. *See, e.g., Thomas v. Johnson*, 2006 WL 3091088, at *6 (W.D. Va. Oct. 22, 2006) (denying habeas petition's equal protection claim where sufficient indicia of reliability surrounded identification testimony). Therefore, Johnson is not entitled to habeas relief on equal protection grounds.

D.     Summary

In essence, Johnson's principal claim is that his due process rights were violated because his trial was fundamentally unfair. The record establishes otherwise. The trial court, acting as finder of fact and with a full understanding of what happened, had ample evidence before it from which to conclude that any suggestiveness underlying the victim's identification was outweighed by other indicia of reliability. Therefore, his trial was not fundamentally unfair to Johnson, and he is not entitled to habeas relief.

V.      Certificate of Appealability

Pursuant to 28 U.S.C. § 2253(c), unless a circuit justice or judge issues a certificate of appealability ("COA"), an appeal may not be taken from a final order in a proceeding under 28 U.S.C. § 2254. A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 481 (2000)). Here, there is no basis for the issuance of a COA and accordingly, none will issue.

"The denial of a certificate of appealability does not prevent [Petitioner] from appealing the order dismissing his petition so long as he seeks, and obtains, a certificate of appealability from the court of appeals." *Martz v. Mooney*, 2016 WL 2347189 (M.D. Pa. May 4, 2016). *See also* Fed. R. App. P. 22(b)(1), (2).

VI.     Order

Based on the foregoing, Petitioner's petition for habeas corpus, (ECF No. 3), is denied.

A COA will not issue.

Entered this 22nd day of February, 2022.

BY THE COURT,

RICHARD A. LANZILLO
United States Magistrate Judge